385 S.E.2d 393

**Gerald Phillip CHURCH**

**v.**

**V.R. WESSON.**

**No. 18486.**

Supreme Court of Appeals
of West Virginia.

June 8, 1989.

W.A. Thornhill, III, Thornhill, Kennedy & Vaughan, Beckley, for Gerald Phillip Church.

Sprague W. Hazard, Steptoe & Johnson, Charleston, for W.R. Wesson, a corp.

## PER CURIAM:

This is an appeal by Gerald Phillip Church from a final order of the Circuit Court of Raleigh County denying his motion for a new trial. The appellant argues that the trial court erred in directing a verdict in his products liability action on strict liability in tort for design defect and failure to warn. Upon a review of the record, we find that the appellant failed to establish a *prima facie* right of recovery on these issues; thus, we affirm the decision of the trial court.

On July 14, 1982, the appellant, while employed as an underground coal miner for Beckley Coal Mining Company, sustained a serious injury to his face, mouth, and teeth. At the time of the injury, the appellant was one of a three-man crew working with a Fletcher dual head roof bolting machine. A roof bolt wrench is attached to the machine and is operated by a lever. The appellant had just relieved one of the crew and was drilling an eight-foot roof bolt when his injury occurred. The twenty-four-inch roof bolt wrench he was using fractured at the weld, where the socket joins the extension, and a piece of the wrench struck the appellant in the mouth.

The appellant sued V.R. Wesson, the designer and manufacturer of the roof bolt wrench, for strict liability in tort. The appellant contended that Wesson should be held strictly liable because of defective design, defective manufacturing, and for failure to warn of the dangers associated with using the wrench.

At the conclusion of the evidence, the trial court granted Wesson's motion for a directed verdict on the theories of defective design and failure to warn. The court did allow the issue of defective manufacturing to go the jury. The jury returned a verdict for Wesson. The appellant's motion for a new trial was denied by an order dated January 4, 1988. The appellant appeals.

■ We review the trial court's ruling in accordance with the guideline set forth in syllabus point 3 of *Roberts v. Gale,* 149 W.Va. 166, 139 S.E.2d 272 (1964):

When the plaintiff's evidence, considered in the light most favorable to him, fails to establish a prima facie right of recovery, the trial court should direct a verdict in favor of the defendant.

*See Covey v. Fields,* 177 W.Va. 481, 354 S.E.2d 413 (1987); *Hinkle v. Martin,* 163 W.Va. 482, 256 S.E.2d 768 (1979). Hence, the dispositive question is whether the appellant's evidence established a *prima facie* case on the issues of defective design and/or failure to warn.

Wesson has manufactured roof bolt wrenches since 1977.[1] Wesson subjects steel tubing to a series of heat treatments to harden the steel, and then welds the tubing onto a socket. At trial, James Magor, a metallurgical engineer, testified for

---

1. The record is unclear as to when the fractured wrench was manufactured.

the appellant. Dr. Magor examined the fractured wrench on two occasions. In his first report, dated January 21, 1986, Dr. Magor opined that the wrench had sustained a fatigue-type failure caused by impairment from extended use. After a second examination, Dr. Magor changed his evaluation, and asserted that the wrench failed in a single overload event caused by its defective design.

Dr. Magor testified that the welding in the manufacturing process had softened the metal so that the tensile strength in the area of the weld was lower than the tensile strength in the remainder of the wrench. Dr. Magor posited that welding the socket to the shaft of the wrench was an improper design because the wrench:

... is exposed to torsion stresses and bending stresses, and as such the integrity should not be weakened by putting a weld in which not only softens the shaft and lowers its strength, but also because of the abrupt change in contour, in shape, gives you a stress concentration exactly where the shaft broke.

Dr. Magor suggested that a forging procedure [2] would have been more appropriate. On cross-examination, Dr. Magor admitted that he had absolutely no experience in designing or manufacturing roof bolt wrenches. Moreover, Dr. Magor testified that he had never even seen a Fletcher dual head roof bolting machine.

The appellee rebutted Dr. Magor with the testimony of two expert witnesses, Wesley Richardson and Gregory DuBois. Mr. Richardson, manager of quality control for V.R. Wesson, testified that the wrench had undergone extensive use and as a result sustained a fatigue-type failure. Mr.

Richardson testified that the "welding process" employed by V.R. Wesson was the "state of the art" at the time the fractured wrench was manufactured. There were three major manufacturers of roof bolt wrenches, and all manufacturers used the welding process. Apparently this design was very successful because of the 7,903 roof bolt wrenches sold by V.R. Wesson, all with a welding design identical to the wrench involved, none had previously failed.[3] Furthermore, Mr. Richardson explained that at the time the fractured wrench was manufactured it was impossible to make it by forging.[4]

Gregory DuBois, vice president of Columbus Testing Laboratory and director of the company's metallurgical, chemical, and products testing department, also testified on behalf of Wesson. Mr. DuBois inspected the wrench, tested its hardness, and viewed it through a scanning electron microscope. Based on this investigation, Mr. DuBois testified that the wrench sustained a fatigue-type failure. Mr. DuBois stated that the wrench was generally a very safe product and had a safety factor of 6.5 to 1.[5]

At the conclusion of the evidence, the appellee renewed his motion for a directed verdict. After a brief recess, the trial court granted the appellee's motion because there was insufficient evidence presented of either defective design or failure to warn of any danger associated with using the wrench.

■ The cause of action in products liability cases "... focuses on the nature of the defect and whether the defect was a proximate cause of the plaintiff's injury." *Morningstar v. Black and Decker Mfg. Co.*, 162 W.Va. at 888, 253 S.E.2d at 682.

---

2. Forging involves forming the metal by a mechanical or hydraulic press with or without heat. *Webster's Third New International Dictionary* 891 (1970).

3. This evidence was introduced without objection.

4. Mr. Richardson testified that in order to make the wrench by forging:

The end that has the socket requires a great deal of steel movement to form that socket. In order to achieve that you have to go through a series of stages of changing from

the tubing shape to form up into the socket shape, and at that point and [sic] time we had not been able to succeed in doing that. No other manufacturers had succeeded at that point and [sic] time either.

5. The safety factor is defined as the ratio of the strength of the material divided by the loads or strengths that would be expended or anticipated in use. A safety factor of 6.5 to 1 means that the strength of the material is 6.5 times greater than the anticipated load.

In syllabus point 4 of *Morningstar*, this Court held:

In this jurisdiction the general test for establishing · strict liability in tort is whether the involved product is defective in the sense that it is not reasonably safe for its intended use. The standard of reasonable safeness is determined not by the particular manufacturer, but by what a reasonably prudent manufacturer's standards should have been at the time the product was made.

*See Chase v. General Motors Corp.*, 856 F.2d 17 (4th Cir.1988). "The question is: did the manufacturer use reasonable care in designing and manufacturing the product at the time it was marketed, not whether it could possibly have been made better or more safe, or later has been made better or more safe." *Chase v. General Motors Corp.*, 856 F.2d at 20. *See* syllabus point 5, *Morningstar v. Black and Decker Mfg. Co., supra.*[6]

■ In applying this standard to the appellant's cause of action for defective design, we find that the appellant failed to establish a *prima facie* right of recovery. Although Dr. Magor suggested that the forging procedure may have been a more appropriate design, it was undisputed that the forging procedure was not feasible when the fractured wrench was manufactured. The appellee's expert testimony established that the welding process employed by V.R. Wesson was the "state of the art" at the time of manufacture. Moreover, on cross-examination Dr. Magor's credibility was severely impeached when he admitted that he had never designed nor manufactured any mining supplies, nor was he familiar with the Fletcher dual head roof bolting machine.

■ The appellant further contends that the trial court committed reversible error

by directing a verdict on the issue of failure to warn. In *Morningstar*, this Court stated that in failure to warn cases " ... the focus is not so much on a flawed physical condition of the product, as on its unsafeness arising out of failure to adequately label, instruct or warn." *Morningstar v. Black and Decker Co.*, 162 W.Va. at 888, 253 S.E.2d at 682. In ascertaining whether a duty to warn exists, the basic inquiry is whether it was reasonably foreseeable to the manufacturer that the product would be unreasonably dangerous if distributed without a warning. "A manufacturer is not required to produce an accident-free product; however, if the danger encountered by the plaintiff was reasonably foreseeable, the manufacturer has a duty to warn of that hazard." T. Travers, *American Law of Products Liability* 3d § 33.2 (1st ed. 1987). *Cf.* syllabus point 3, *Ilosky v. Michelin Tire Corp.*, 172 W.Va. 435, 307 S.E.2d 603 (1983).

■ The appellant did not present any evidence on whether it was foreseeable to Wesson that the wrench would fracture. Indeed, the only evidence presented was that there had never been a reported fracture of a roof bolting wrench. Hence, under the rule prescribed in *Roberts v. Gale, supra*, the trial court properly granted the appellee's motion for a directed verdict on this issue.

Accordingly, the decision of the Circuit Court of Raleigh County is affirmed.

Affirmed.

---

**6.** In syllabus point 5 of *Morningstar v. Black and Decker Mfg. Co.* we explained:

The term "unsafe" imparts a standard that the product is to be tested by what the reasonably prudent manufacturer would accomplish in regard to the safety of the product, having in mind the general state of the art of the manufacturing process, including design, labels and warnings, as it relates to economic costs, at the time the product was made.